UNITED STATES v. The JANE CAMPBELL. See Cases Nos. 7,205 and 7,206.

## Case No. 15,468.
### UNITED STATES v. JARVIS.

[2 Ware (Dav. 274), 278;[1] 4 N. Y. Leg. Obs. 298.]

District Court, D. Maine. Feb. Term, 1846.

OFFICERS OF THE UNITED STATES — EXTRA COMPENSATION — CONSTRUCTION OF APPROPRIATION ACTS—PRINCIPAL AND AGENT—NAVY AGENT—REMOVAL FROM OFFICE—RENT AND CLERK HIRE.

1. Under the act of congress of March 3, 1839, c. 82, § 3 [5 Stat. 349], no officer of the

[1] [Reported by Edward H. Daveis, Esq.]

United States, whose salary or emoluments are fixed by law and regulation, is entitled to any extra allowance or compensation in any form for disbursements of public money, or other service, unless the same is authorized by law.
[Cited in Browne v. U. S., Case No. 2,036.]

2. In the construction of temporary statutes, as annual appropriation acts, the presumption is that any special provisions of a general character, contained in such acts, are intended to be restricted in their operation to the subject-matter of the act, and they are not to be construed to be permanent regulations, unless the intention of making them so is clearly expressed.

3. The power of an agent may be revoked at any time by the principal, without notice, but if the agent, in the prosecution of the business of his principal, has fairly and in good faith, before notice of the revocation of his powers, entered into any engagements or come under any liabilities, the principal will be bound to indemnify him.

4. So an agent, after accepting an agency, cannot renounce it at pleasure, without notice or good cause, but on the condition of rendering himself responsible for any loss which may thereby be sustained by the principal.

5. No one can change his will to the injury of another where mutual rights and obligations exist between the parties.

6. These principles, having their foundation in natural equity, apply as well between the government and an individual as when both parties are private persons.

7. The defendant was appointed navy agent for four years, but removable at any time within the four years at the pleasure of the president. He was removed six months before the term expired, and without previous notice. Before his removal he had hired an office on a parol lease, the quarter terminating three days after his removal. Not having given notice of his intention to quit he became, by the local law, bound for one quarter's rent. He had also hired a clerk for the year terminating with the close of his term. On dismissing his clerk he paid him $200, or one quarter's salary after his discharge.

8. It was *held*, that these engagements having been fairly and properly made in executing the business of his agency, the United States were bound to indemnify their agent, and that these charges were an equitable set-off under the act of March 3, 1797 [1 Stat. 512].

This was an action of debt on the official bond of the defendant [Leonard Jarvis], as navy agent for Boston and Charlestown, for a balance alleged to be due from him on the final settlement of his accounts. The defendant was appointed navy agent in April, 1838, to hold the office during the pleasure of the president, for a time not exceeding four years. The compensation allowed for his services was one per cent on the amount of his disbursements, but not to exceed in the whole $2,000 a year. He was removed from office, September 27, 1841, six months and three days before the term of four years expired, and the first notice he had of his removal, or of an intention to remove him before the expiration of the term, was by the appointment of a successor. On the final settlement of his accounts by the accounting officers, there was found to be a balance due the United States of $715.97. The defendant claimed to be allowed $452.18, as commissions of one per cent on $45,218.59 paid to the heirs

of John Harris, for certain lands purchased by the secretary of the navy for the navy yard, as being an extra service, not coming within the regular duties of the navy agent, and for which he claimed to be entitled to a separate and additional compensation. And he also claimed $26.29, being the amount of several small items for office rent and charges for the remainder of the quarter ending October 1. and also one quarter's office rent from October 1 to December 31, 1841, after his removal from office. The defendant hired his office by a parol lease, and not having given seasonable notice of his intention to surrender it before the expiration of the quarter ending in October, by the local law of Massachusetts he became liable for an additional quarter's rent, which was paid by him, and the receipt is in the case. He also claimed $200 for one quarter additional clerk hire. His clerk was hired for a year terminating with April 1st, 1842. when the defendant's appointment would expire by its limitation. The clerk, being hired for the year. claimed his salary under the contract, but compromised for one quarter's salary instead of the whole balance, which was half a year. The amount charged for office rent and clerk hire was the same as had been allowed from quarter to quarter in his previous settlements.

Mr. Haines, U. S. Dist. Atty.
Mr. Preble, for defendant.

WARE, District Judge (charging jury). The most considerable item claimed by the defendant in off-set is $452.18 charged as commissions on the disbursement of $45,-218.59, paid to the heirs of John Harris, for lands purchased for the navy yard in Charlestown. The owner of the land not having left children, the money was to be paid to his collateral heirs, and. as the secretary could not himself conveniently ascertain who they were, he employed the defendant to do the business. In his letter to him he says: "The money is sent to you that no mistake may occur as to paying it to the party entitled to. receive it;—and to guard against any such mistake you are requested to consult the United States district attorney, Mr. Mills, and to pay over the amount and to take the proper receipts and acquittances for the same under his advice and direction." It is apparent that the service to be performed was one not only of considerable responsibility but of some delicacy; for if the defendant had paid the money to a wrong person he might have rendered himself responsible, and if he is entitled to any compensation it is not contended that the sum charged is too much. But it is argued by the district attorney that he is not entitled to any, but that he was bound to perform this service for the compensation which he received as navy agent. That salary was established as a compensation for performing the ordinary service attached to the agency. Now this does not appear to fall

within the range of his ordinary duties as navy agent, and it appears to me to be so treated by the secretary in his letter. It was an extra service, and attended with additional responsibility. But then it is argued by the attorney that, admitting this. he is barred from receiving any additional compensation by the third section of the act of congress of March 3, 1839. That section. so far as it applies to this case, is in these words: "No officer in any branch of the public service, or any other person whose salary and emoluments are fixed by law and regulation, shall receive any extra allowance or compensation in any form whatever for the disbursements of public money, or the performance of any other extra service, unless the said extra allowance or compensation be authorized by law." The defendant was an officer whose pay and emoluments were fixed. It must then be admitted that the case comes within the words of the law, and must be governed by it, if the law is applicable to the case. But this is the very point which the defendant's counsel deny. The act, in which this section is found, is one of the annual appropriation acts. Its title is, "An act making appropriations for the civil and diplomatic expenses of the government for the year eighteen hundred and thirty-nine." The first section contains more than two hundred clauses. making as many distinct appropriations for the various branches of the public service, and embracing all the civil and diplomatic expenses for the current year. The second section contains a special provision to which I shall presently refer, and the third has the clause which has been read. and which it is contended governs this case.

The argument of the defendant is, that this section is intended to apply to the subject-matter of the act only, and is to be confined to the disbursements of the appropriations contained in the act. This is, perhaps. the construction that would at first most naturally suggest itself. The act itself is one of those annual acts which spend their power in the course of the year. to which we are not accustomed to look for permanent regulations. If the legislature annex to such an act any special provision which has a proper application to the subject matter of the act, and use no words indicating an intention to give it a more extensive operation, the just conclusion would seem to be, that the special regulation was intended to be confined to the matters embraced by the act. It is remarked by Mr. Justice Story in delivering the opinion of the court, in Minis v. U. S., 15 Pet. [40 U. S.] 445. that "it would be somewhat unusual to find engrafted, on an act making special and temporary appropriations. any provision which was to have a general and permanent application to all future appropriations. Nor ought such an intention on the part of the legislature to be presumed. unless it is expressed in the most clear and positive terms. and when the language admits of no other reasonable

interpretation." This is emphatic language, and places this, as a rule of interpretation, on strong ground. The second section of this act also contains a special regulation applying to collectors of the customs, which is clearly intended to be permanent. It requires them to place money received on unascertained duties, or duties paid under protest, at once to the credit of the treasurer. The first words of the section are: "From and after the passage of this act all moneys paid to any collector," etc., words the meaning of which cannot be mistaken. But there are no words of the like import in the third section, and the omission of them undoubtedly favors the interpretation put upon it by the defendant's counsel. But, then, though these are the formal words most usually employed to exclude a doubt whether the regulation was intended to be permanent or not, they may be supplied by other language clearly indicating the intention of the legislature. Now it is quite certain that this section must extend to matters beyond the appropriations contained in the act. It provides that no officer in any branch of the public service, or any other person whose salary and emoluments are fixed by law or regulation, shall receive any extra allowance or compensation in any form, unless it is authorized by law. Now this act embraces but part of the appropriations for the year, so that we are necessarily carried beyond the subject-matter of this act. It must extend itself over all the appropriations of the year at least; and though it may be said that this clause of the law does not necessarily look beyond the current year, yet the second clause of the section evidently does. That provides that no executive officer, other than heads of departments, shall apply, from the contingent fund of which they have the control, more than thirty dollars annually, to pay for newspapers and pamphlets. The word "annually" here is necessarily prospective, and extends the operation of this clause to future years. There are, in the first clause, no restrictive words confining it to the current year. · If part of the section was intended to be permanent, it is quite natural to suppose the whole was. It would be very unusual to unite, in a single section of a law, one provision intended to be permanent, with another intended to be temporary, without clearly distinguishing the permanent from the temporary part. My opinion is, that this section is a conclusive bar to the allowance of the commissions claimed on the disbursements in question; and whatever we may think of the equity of the claim, it is not for the court or the jury to be wiser or more indulgent than the law. This case was referred to in Browne v. U. S. [Case No. 2,036], as allowing the commission. It was a mistake.

This disposes of but part of the case. The other allowances claimed involve questions of much more delicacy and difficulty. The defendant claims an allowance of $26.29, for office rent for the three remaining days of the quarter ending October 1, and also for rent for the quarter following. These two claims stand on the same ground, and may be considered together. An office or place of business was necessary for the discharge of the duties of the agency, and the rent had been charged and allowed, at the same rate, in previous quarters. It is admitted that it was hired and used by the defendant for the purpose of the agency and for no other, he not being engaged in any other business that required his having an office. It was hired on a parol lease; and, not having given reasonable notice of his intention to quit before the termination of the quarter, by the law of Massachusetts he became bound for another quarter's rent. Rev. St. Mass. pt. 2, tit. 1, c. 60, § 26. The ground of the claim is this: that, having been dismissed from office when it was too late to give the notice required by law, and having himself no previous notice that he was to be superseded, this is a loss which he incurred without fault on his part, in the business of the plaintiffs, for which they were bound to indemnify him. The answer is, that he held his appointment at the mere will of the president, and, being liable to be removed at any time without notice, he might have provided for the contingency in his contract.

If this was a question between two individuals, and not between an individual and the government, I cannot say that I should feel much difficulty in arriving at a conclusion satisfactory to my own mind. It was necessary, in the transaction of the affairs of the agency, that the defendant should have a place of business where he might be found in business hours. It was engaged on a parol lease, and by law he was bound to give reasonable notice of his intention to quit, or he became bound for another quarter's rent. He had held the agency for three years and a half, and the term for which he was appointed would not expire by its own limitation for six months. No complaint had been made against him, and he had no reason to suppose that he would be superseded before the expiration of that time. If he had engaged his office in the usual course of business, and there was nothing unreasonable in the terms on which it was engaged, considering the tenure on which he held the appointment, the principal would be liable for the loss. The question for the jury would be, whether an agent holding an appointment of so much importance, though the agency was revokable at will, should be expected to engage his office rooms on a tenancy from day to day, or week to week. If the jury should think that he acted prudently and in good faith, with a just regard to the interest of his principal, then I should say that in law he was justly entitled to look to his principal for an indemnity for a liability fairly incurred in the prudent prosecution of his proper business.

It is true that when a man appoints an agent or mandatary without limitation of

time, he may always revoke the appointment at will. A person may enter into many other engagements liable to be dissolved at will, but which, where other persons have fairly, and in the usual course of business, acquired an interest under them, the law will prevent him from dissolving them at an unreasonable time; or if it does not absolutely prevent the act, will hold him to indemnify those who may suffer an injury from it. This is a general rule of justice and equity, which is found in every system of refined and cultivated jurisprudence. The engagements may be terminated at will, but then this will must be exercised reasonably, and not in mere wantonness or malice. An illustration of the principle may be drawn from the contract of partnership. When entered into without any limitation of time, it may always be dissolved at the will of any of the parties. In that highly cultivated system of jurisprudence which forms the basis of the law of the whole continent of Europe, the Roman law, the renunciation of the partnership by one of the parties, to be valid, must be made in good faith, and not at an unreasonable time, to the injury of the common interest; for it is not, says the law, the private interest of the individual partner, but the common interest of the partnership that is regarded.[2] This principle, so conformable to natural equity, to good faith, and fair dealing, was adopted from the Roman law by the ancient jurisprudence, and is confirmed by the new Civil Code of France. Poth. Contrat de Societe. Nos. 150, 151; Code Civil Francais, Nos. 1869–70. And although no such restriction is perhaps established in the common law, yet it seems that a court of equity will interpose and restrain a partner from wantonly and maliciously putting an end to the engagement, to the injury of the common interest. Story, Partn. § 275, note.

But the case of a parol lease at will, which arises in the present case, is one which perhaps still more clearly shows, that when it is said that an engagement is liable to be terminated by either party, it is, in the sense of the law, a will under the control of reason and justice. Though it is said to be a contract merely at will, yet, independent of every statute regulation at the common law, the lessor cannot, without notice, eject the tenant and turn him into the street, nor can the tenant discharge himself from the liability to pay rent without giving the landlord reasonable notice, to enable him to find another tenant. 4 Kent, Comm. 111. These restrictions on the capricious and wanton exercise of the will, where the interests of other persons are affected, have their foundation in a rule of universal equity and justice, arising from the social nature of men, that a man shall so use his own rights as not to injure another. "Sic utere tuo ut alienum non lædas." This reasonable and equitable principle has also its application in the law of agency. There is no doubt, as a general rule, that the appointment of an agent may at any time be revoked by the principal without giving a reason for it, because it is the right of every man to employ such agents as he sees fit. The agent also has the same general right to renounce the agency at his own will; for it is an engagement at the will of both parties. But the contract of agency, or mandate, involves mutual obligations between the parties; and these commence, if not as soon as the appointment is made, at least as soon as the agent or mandatary commences the execution of the agency. If he has entered on the business, even if he does not accomplish prosperously what he has undertaken, he will be entitled, from his principal, to an indemnity for his expenses and services, if the failure does not arise from his own fault. Dom. Lois Civiles, liv. 1, tit. 15. § 2, Nos. 1, 2. After he has engaged in the business of the agency, the principal may at any time revoke his powers and dismiss him from his service. But if his power is thus revoked, the principal will be responsible to him for any engagements he may have entered into, and any liabilities he may have incurred in good faith, in the proper business of the agency, before he had notice of the revocation. Id. § 4, No. 1. And so the agent, after entering on the business, may renounce the agency. But then this must be done in good faith, and be preceded by reasonable notice, or the agent will be liable to the principal for any loss that may result to him from this cause. The agent cannot withdraw himself from his engagement wantonly, and without reasonable cause, without rendering himself responsible for the consequences. Id. Nos. 3, 4; Poth. Mandat. No. 44; Dig. 17, 1. 22. § 11, Id. 1, 27. § 2. And when a man has undertaken an agency, he will not merely render himself liable for damages to his principal, if he renounces the agency without notice and without just cause, but a court of equity will go further. If an agent is employed to make a purchase, and, finding the speculation likely to prove profitable, he renounces the agency and purchases for himself, equity will hold him a trustee for the principal, and give him the benefit of the purchase directly, without putting him to an action for damages. 1 Story, Eq. Jur. § 316.

It may be true that in our jurisprudence a precise authority may not be found for all these propositions among the adjudged cases. But they rest on such clear grounds of justice and good faith, that they may be well taken for granted without the authority of a direct decision (Story, Ag. § 467), and they all stand approved by the authorities of the

---

[2] "Semper enim non id, quod privatim interest unius ex sociis, servari solet, sed quod societat expedit. Item, qui societatem in tempus coit, eam ante tempus renunciando, socium a se, non se a socio, liberat. Itaque, si quid compendii postea factum erit, ejus partem non fert: atsi dispendium, æque præstabit portionem nisi renunciatio ex necessitate quadam facta sit." Dig. 17, 2, 65. §§ 5 and 6.

Roman law. They all flow from a great principle of social justice. A man cannot, wantonly and without reasonable cause, retract or annul his own acts and change his purpose, when others, in the ordinary course of business and in good faith, have acquired an interest in them, to the injury of such persons, without rendering himself liable to repair such injury. The greatest of the Roman jurisconsults reduced the rule to a short and pithy maxim: No man can change his will to the injury of another. Dig. 50, 17, 75. "Nemo potest mutari consilium suum in alterius injuriam." It is applied in some cases where no previous engagements exist between the parties, but its application is peculiarly stringent when mutual obligations by contract do exist. "If I agree with a mechanic," says Pothier, "to build me a house, and after the agreement I change my purpose and determine not to build, I may dissolve the engagement by giving him notice of the change of my will; but if before the notice he has purchased materials for the work and engaged workmen, I shall be bound to indemnify him for the loss he sustains by the change of my purpose." Contrat de Louage, No. 440; 19 Duvergier, Droit Civil Francais, § 370. If this was a case between two private persons, the case put by Pothier would differ in no essential particulars from the present. Both are contracts of hiring; for the contract with a salaried agent or mandatary is essentially a contract of hiring, though in some respects distinguishable from the common contract for the hire of labor. Id. tit. 8, c. 3. The defendant was a salaried agent, and he had, for the sole purpose of the agency and for the sole benefit of his principal, hired an office. He held, as all agents do, the appointment at the will of the principal, and he is dismissed without notice, while under this liability for rent. If the engagement of his office was, as to the terms, reasonable and proper and in good faith, under the circumstances, the justice of the case appears to me so clear, that the very statement of the facts carries with it the answer, and that conforms to the well-established principles of law.

The other charge, for clerk hire, does not appear to me to be distinguishable in principle from the rent. It is admitted that in the business of the agency a clerk was indispensable, and he had been allowed, as all officers of this description are, a reasonable sum for clerk hire. The amount claimed is the same as had been allowed and paid in previous quarters. The clerk was engaged for a year, terminating with the expiration of the term of the defendant's appointment; and, in strict law, he might, perhaps, have recovered his salary for the whole of the unexpired year. 2 Smith, Lead. Cas. (Am. Ed.) p. 25. The defendant compromised the claim by paying one quarter's salary. Is the defendant, who has been compelled to pay this sum for a liability incurred in the business of the plaintiffs, entitled to be indemnified by his principal? If the contract with the clerk were a reasonable and proper one under the circumstances of the case, the decision referred to, from Pothier, shows how it would be decided in a controversy between individuals. And whether the contract was, as to the period for which he was engaged, reasonable and proper, would be a question for the jury. If the duties of the clerk were such as might be safely intrusted to any ordinary person, it might be questionable whether the defendant, knowing the tenure of his own office, would be justified in contracting with him for a year. But it is to be remembered that the agency of the defendant involved great responsibilities, he having contracts and disbursements to make to the amount of several hundred thousand dollars a year, and in the transaction he required a clerk in whom he could place the most unreserved confidence. It is hardly to be expected that a person of such qualifications would be willing to engage his services on the same terms as a common day laborer. One who is fit to be trusted can usually engage on terms of more permanency; and one who would be willing to engage on such precarious conditions, as to be dismissed at any time without notice, the defendant might not be willing to trust to such an extent, that, if he proved unfaithful, he might himself be involved in ruin. Both his own safety and the interest of his principal would require him to act with more circumspection. When the defendant engaged his clerk, a year of the term for which he was appointed remained, and he had no reason to expect that he would be dismissed before that term expired. If in your opinion the contract with the clerk was, under the circumstances, reasonable and proper, and was a liability incurred in good faith, in the prudent transaction of the business of the agency, on the principles of law and equity he is entitled to an indemnity.

It will be observed that I have treated this case thus far as though it was a controversy between two private individuals; and have stated what appear to me to be the just conclusions of law. Are there any reasons of general justice or public policy, why the same principles should not be applied to these contracts between the government and an individual? After having reflected considerably on the subject, I feel bound to say that none have occurred to me. I know that it appears to be the fixed policy of the country, to hold the tenure of all appointments of this description to be at the will of the president. So also appointments of the same character between private individuals are liable to be revoked at will, and there are very satisfactory reasons why they should be so. But between individuals we have seen that, to a certain extent, this will is regulated and controlled

by the principles of equity, good faith, and fair dealing. If any just cause, for the revocation of an agency, arises out of the conduct of the agent, his powers may be revoked by the principal without subjecting himself to any of the responsibilities which have been mentioned. The agent must bear the consequences of his own misconduct or imprudence. But while he is in good faith prudently engaged in the business of the agency, if his authority is revoked suddenly and without notice, and he thereby suffers loss, the principles both of law and justice require the principal to indemnify him. Why should not the same measures of justice apply between the government and an individual?

If there are no grounds of justice to vary the decision, then I think there are reasons of public policy for holding that the same principles of law apply to one case as to the other. If the tenure of the appointment is merely at will, it is to be remembered that it is equally at the will of both parties. If the principal may revoke the agency without notice, and leave the agent to meet all the liabilities which he has incurred in the prosecution of the business of the agency, then the agent may renounce the agency without notice, and leave all the inconvenience to fall on the principal. I may have taken a very incorrect view of this subject, and, if so, I am happy that my error may be so easily corrected, but it appears to me that one can hardly overstate the public mischiefs that might arise from the establishment of such a doctrine. All the most important officers of the government hold their employments by this tenure. If they may, at any time, renounce and abandon the public business intrusted to them, with impunity, without first giving reasonable notice to the appointing power of their intention, so as to enable the government to supply their places, it is easy to see that inconveniences of the gravest nature might arise. Take a single branch of the public service, the collection of the revenue. Every officer, from the highest to the lowest, holds his office at will. Suppose the principal revenue officers of one of our large ports should at once come to the determination of abandoning their offices, and send by the mail notices of their resignation when there were cargoes in port, duties on which, to a large amount, would be due. In some ports it is not uncommon for duties to accrue to the amount of half a million, by the arrivals of a single day. There would be nothing to prevent all the goods from being smuggled ashore before the president could replace the officers by new appointments. If it be said that this is putting an improbable case, it at least fairly tries the principle. and it must be allowed to be a possible case. If the law be as I suppose it to be, and the same measure of justice and the rules of good faith and fair dealing hold between the government and an individual in public agencies,

as do between individuals in private agencies, then the officer, before renouncing his trust, is bound to give reasonable notice to the government, that the appointing power may have time to put another in his place; and if he abandons it without giving such notice, whether it is done corruptly and in bad faith, or in mere wantonness and caprice, he is legally bound to indemnify the government for all the loss that may be thereby sustained.

On the whole, the view that I have of the law is this: The principal may at any time revoke and withdraw the power of an agent at his pleasure, and without notice. This is a right that is fully reserved to him by the law. But if the agent has entered on the business of the agency, and has fairly, in the ordinary course of business, and in good faith, entered into any engagements, or come under any liabilities, in the prosecution of the proper business of the principal, before notice of the revocation of agency, the principal will be bound to indemnify him, unless the agent had given just cause for such revocation. In the same manner the agent may at any time renounce the agency, but then he is bound to give the principal reasonable notice of his intention beforehand, to enable him to procure another agent; and if he does not, he will be bound to indemnify the principal for any loss he may sustain. And the same principles hold whether the government and an individual are parties, or both parties are private persons.

If the law be as it has been stated, the determination of this cause depends on a question of fact, which properly belongs to the jury to decide. If the jury are of opinion that the defendant, in engaging his office and his clerk on the terms he did, acted in good faith according to the usual course of business, and that the conditions, as to the time on which they were made, were reasonable and proper, and such as a faithful and prudent agent would make, acting for the benefit and interest of his principal, the jury ought to find for the defendant. They were liabilities incurred solely in the business of the plaintiffs, and for their benefit, from which the defendant himself derived no advantage, and for which the plaintiffs are bound to indemnify him. The defendant having actually paid these sums, under the statute of the United States of March 3, 1797, c. 74 [1 Story's Laws, 464; 1 Stat. 512], they constitute an equitable set-off against the plaintiff's demand. But if under the circumstances of this case, the defendant having been appointed to his agency for four years, of which six months remained, but liable to be removed at any time at will before the expiration of the four years, the jury are of opinion that he ought, as a prudent agent. to have engaged his office, and also his clerk, from day to day, or from week to week, or what would come to the same thing. merely at will, with the liberty of surrendering the office and of discharging his clerk at any

time, without notice, and consequently liable at any time to be turned out of his office, and to be left by his clerk, without notice, then you will find your verdict for the United States for the amount of these items, with interest from the time when they should have been paid.

The jury returned a verdict for the United States, for the sum of $532.26; allowing the set-off for office rent and clerk hire, as charged by the defendant, and disallowing the commissions charged on the disbursements to Harris's heirs.

[A writ of error was sued out in the circuit court, but was subsequently dismissed. Case No. 15,469.]